John Morrison
Scott Peterson
MORRISON, SHERWOOD, WILSON, & DEOLA, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
ph. (406) 442-3261
fax (406) 443-7294
john@mswdlaw.com
speterson@mswdlaw.com

Robert S. Boulter*
LAW OFFICES OF ROBERT S. BOULTER
1101 5th Ave #310
San Rafael, CA 94901
ph. (415) 233-7100
rsb@boulter-law.com
Attorney for Plaintiff Matthew Quinn
*Application for Admission Pro Hac Vice Pending Submission

*Attorneys for Plaintiff Matthew Quinn*

## UNITED STATES DISTRICT COURT
## DISTRICT OF MONTANA - BILLINGS DIVISION

| | |
|---|---|
| MATTHEW QUINN, an individual, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>MEADOW LARK TRANSPORT, INC., MEADOW LARK COMPANIES, INC., MEADOW LARK AGENCY, INC.,<br><br>Defendants. | Cause No: CV-22-55-BLG-SPW-TJC<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |

## INTRODUCTION

1.     This class action lawsuit is brought against trucking company Meadow

Lark Transport, Inc. "Meadow Lark Transport"), Meadow Lark Companies, Inc,

("Meadow Lark Companies") and Meadow Lark Agencies, Inc. These entities are

collectively referred to as "Meadow Lark." The case arises out of "lease-driver" business opportunity program (the "Driving Opportunity") whereby certain truck drivers ("Drivers") leased trucks from Meadow Lark Transport and simultaneously provided driving services to Meadow Lark utilizing such trucks. Drivers are licensed commercial drivers responsible for safely operating a commercial vehicle and transporting Meadow Lark customers' cargo.

2.     Plaintiff Matthew Quinn (hereinafter, "Quinn") and the members of the putative Class ("Drivers") are current and former Drivers for Meadow Lark.

3.     When selling the Driving Opportunity to Drivers, Meadow Lark failed to disclose material facts about the economics of the Driving Opportunity, the income, and the overall material terms and conditions the Driving Opportunity did and would provide in order to induce Drivers to purchase the Driving Opportunity. Meadow Lark thus defrauded the Drivers into paying for the bulk of the expenses of transporting goods for Meadow Lark customers including such items as truck lease payments, gas, maintenance, computers, insurance, and other expenses associated with the Driving Opportunity. After paying such expenses, the Drivers often had little or no compensation or sometimes even owed Meadow Lark money despite the long hours they worked as Drivers.

4.     In connection with the offer, sale, and/or operation of the Driving Opportunity, Meadow Lark (1) violated the federal Truth-in-Leasing Regulations, 49 C.F.R. § 376.1 et seq. (made actionable under the Motor Carrier Act under 49 U.S.C.

§14704 et seq.); (2) violated the Montana Employee Indemnification Act, Mont. Code Ann. § 39-2-701; (3) committed constructive fraud, (4) breached the applicable contracts, and (5), to the extent enforceable contracts do not exist between Meadow Lark and the Drivers, was unjustly enriched.

5.     Quinn was a Driver from approximately June 2020 to June 2021. Quinn seeks to certify an appropriate class action under Rule 23 of the Federal Rules of Civil Procedure.

6.     Quinn seeks damages, declaratory, equitable, and injunctive relief, as well as available attorneys' fees and costs on behalf of himself and the Drivers.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2)(A), because the aggregated claims of the putative class members exceed the sum value of $5,000,000, exclusive of interests and costs, and this is a class action in which at least one member of the putative Class, on the one hand, and Defendant, on the other, are citizens of different states.

8.     This Court also has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims herein arise under the Motor Carrier Act, 49 U.S.C. §14704, et seq. This Court has supplemental jurisdiction over the state law claims because those claims arise out of the same nucleus of operative fact as the federal claims.

9.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), inasmuch as each defendant has its headquarters and offices, conducts business, and can be found in the District, and a substantial part of the events or omissions giving rise to Quinn's claims occurred in this judicial district. Venue is further proper under 29 U.S.C. § 1132(e)(2) because defendants have substantial business contacts within the state of Montana and in this District.

## PARTIES

10.    Plaintiff Matthew Quinn is a resident of the State of Texas.

11.    Quinn performed work as a Driver for Meadow Lark from approximately June 2020 to June 2021. Quinn regularly engaged in Meadow Lark's business in various locations, including within this judicial district.

12.    Quinn is informed, believes, and thereon alleges that Meadow Lark Transport is a Montana corporation with its principal place of business in Billings, Montana. During the relevant time period, Meadow Lark Transport was and is engaged in business throughout the United States, including in Montana. Meadow Lark Transport's primary business consists of providing transportation services to various clients.

13.    Quinn is informed, believes, and thereon alleges that Meadow Lark Companies, Inc. is a Montana corporation with its principal place of business in Billings, Montana. During the relevant time period, Meadow Lark was and is engaged

in business throughout the United States, including in Montana. Meadow Lark's primary business consists of providing transportation services to various clients.

14.    Quinn is informed, believes, and thereon alleges that Meadow Lark Agency, Inc. is a Montana corporation with its principal place of business in Billings, Montana. During the relevant time period, Meadow Lark Agencies was and is engaged in business throughout the United States, including in Montana.

## GENERAL ALLEGATIONS

15.    During the time period relevant to this action, Meadow Lark has employed Drivers to provide long haul delivery services to Meadow Lark customers. Drivers work regular schedules for Meadowlark, often 6-7 days per week, and 11-14 hours per day, in order to meet Meadow Lark service and stand-by demands. As a result, it is impracticable for Drivers to take on any other employment outside of Meadow Lark.

16.    In order to induce Drivers to purchase the Driving Opportunity and defraud them out of their labor and money, Meadow Lark, from its headquarters in Montana, directed and implemented a fraudulent scheme.

17.    Meadow Lark represented to all Drivers that it would pay to the Drivers compensation in an amount equal to seventy-five percent (75%) of the gross monies paid to Meadow Lark for each load shipped by its shipping customers. Meadow Lark failed to disclose that it had in the past and would secretly in the future misrepresent and understate the gross moneys received in order to defraud the Drivers. Meadow

Lark has failed to pay Drivers the full promised 75 percent of the actual gross revenue that Meadow Lark received from its customers.

18.     Meadow Lark engaged in the fraudulent scheme described above to induce Drivers into purchasing the Driving Opportunity.

19.     Drivers relied upon Meadow Lark misrepresentations and omissions, and each Driver did purchase the Driving Opportunity. Had Quinn and the other Drivers known the truth, they would not have purchased the Driving Opportunity.

20.     Once in the Driving Opportunity, Drivers were financially dependent upon, and controlled by, Meadow Lark. Meadow Lark had the right to control Drivers, because, among other things, Meadow Lark decided the rates drivers will be paid and the customer loads they will transport, and Drivers were unable to work for others since Meadow Lark had the exclusive possession, control and use of each Drivers' vehicle during the term of the lease and the Drivers were required to be available for service upon demand of Meadow Lark.

21.     Meadow Lark charged Drivers by way of deductions or set offs against their compensation for purported insurance premiums and, upon information and belief, Meadow Lark improperly charged the Drivers more than Meadow Lark or its agents actually paid for such coverage on their behalf.

22.     Meadow Lark charged Drivers by way of deductions or set offs against their compensation for unspecified charges called "standard deductions no plate" that was not agreed to under any applicable contracts or otherwise disclosed.

23.     Meadow Lark charged Drivers by way of deductions or set offs against their compensation for fuel and, upon information and belief, Meadow Lark improperly charged the Drivers more than Meadow Lark or its agents actually paid for fuel and/or failed to pass along discounts collected.

24.     Meadow Lark charged Drivers by way of deductions or set offs against their compensation for fuel tax and, upon information and belief, Meadow Lark improperly charged the Drivers more than Meadow Lark Transport actually paid for fuel tax.

25.     Meadow Lark Transport collected fuel surcharges from shipping customers which it was supposed to pass along to the Drivers in the calculation of fuel costs but, upon information and belief, Meadow Lark improperly retained all or part of those surcharges despite the Drivers incurring the cost of fuel.

26.     Upon information and belief, Meadow Lark Transport has employed in excess of four hundred Drivers in the past five years.

27.     In sum, Meadow Lark concealed that the entire Driving Opportunity was a fraudulent scheme designed to bilk the Drivers out of their labor and to have the Drivers pay Meadow Lark unreasonable and/or inflated expenses associated with transporting goods. Meadow Lark motives in perpetuating the scheme were to cut expenses, increase margins on the money Meadow Lark makes selling transportation services, and increase its ability to sell transportation services by pricing below competitor trucking companies that pay drivers and expenses in a lawful fashion.

7

## CLASS ACTION ALLEGATIONS UNDER FED. R. CIV. P. 23

28.     Quinn seeks to maintain his federal and Montana state law claims as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure. In particular, Quinn seeks to certify the following Rule 23 Class:

> All current and former Drivers who leased trucks and drove for Meadow Lark and had deductions taken from their compensation for a truck lease payment in any week within the United States at any time during the period beginning five years prior to the filing of this Complaint and continuing through the resolution of this action.

29.     Excluded from the Rule 23 Class are Meadow Lark's legal representatives, officers, directors, assigns and successors, or any individual who has, or who at any time during the class period has had, a controlling interest in Meadow Lark Transport or the other Meadow Lark entities; the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; and all persons who will submit timely and otherwise proper requests for exclusion from the Rule 23 Class.

30.     Quinn seeks to serve as a Class Representative for the above-defined Class.

31.     Quinn's Montana state law claims have been brought and may properly be maintained as a class action under Rule 23 because there is a well-defined community of interest in the litigation and the putative Class is easily ascertainable.

32.     Numerosity:  The potential members of the Class are believed to exceed 400, and the Class Members are so numerous that joinder of all members is impracticable.

33.    Commonality:  There are questions of law and fact common to Quinn and the Class that predominate over any questions affecting only individual members of the Class. Examples of these common questions of law and fact include, without limitation:

a.    Whether Meadow Lark in the offer, sale, and/or operation of the Driving Opportunity violated the federal Truth-in-Leasing Regulations, 49 C.F.R. § 376.1 et seq. (made actionable under the Motor Carrier Act under 49 U.S.C. §14704 et seq.);

b.    Whether Meadow Lark misclassified Drivers as independent contractors under, and violated, the Montana Employee Indemnification Act, Mont. Code Ann. § 39-2-701 by failing to reimburse Drivers' expenses and losses;

c.    Whether Meadow Lark committed constructive fraud by concealing material facts including the high turnover and failure rates of Drivers, the low average income of Drivers, the low average miles Meadow Lark provided to Drivers, and the excessive and inflated charges to Drivers;

d.    Whether Meadow Lark breached the applicable contracts and implied covenant of good faith and fair dealing, including whether Meadow Lark paid the Drivers the correct amounts, whether Meadow Lark took improper set-offs or deductions from payments due the

Drivers, whether Meadow Lark should have reimbursed the Drivers for certain of their business expenses, and whether Meadow Lark charged excessive and improperly inflated expenses to Drivers;

e.      Whether Meadow Lark was unjustly enriched by the scheme described herein;

f.      The nature and extent of class-wide injury and the measure of damages for those injuries; and

g.      The proper formula and methodology for calculating restitution, damages and penalties owed to Quinn and the Drivers as alleged herein.

34.    Typicality:  Quinn's claims are typical of the claims of the Drivers. Meadow Lark common course of unlawful conduct as alleged herein has caused Quinn and Drivers to sustain the same or similar injuries and damages. Quinn's allegations – both legal and factual – are thereby representative of and co-extensive with the claims of the Drivers.

35.    Adequacy:  Quinn does not have any conflicts of interest with members of the Class of Drivers he seeks to represent, and Quinn will prosecute this case vigorously on behalf of the Drivers. Quinn's Counsel are competent and experienced in litigating consumer and complex commercial class actions. Quinn will fairly and adequately represent and protect the interests of the Class he seeks to represent.

36.    Superiority of Class Action:  A class action is superior to other available means for the fair and efficient adjudication of this controversy. Individual joinder of

all Drivers is not practicable, and questions of law and fact common to the Class of Drivers predominate over any questions affecting only individual Drivers. Each Driver has been damaged and is entitled to recovery by reason of Meadow Lark Transport's illegal practices and violations of law stated in this complaint. Class treatment will allow those similarly situated persons to litigate their claims in the manner most efficient and economical for the Parties and the judicial system.

37.    Quinn knows of no difficulty that would be encountered in the management of this litigation that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF

**Violation of The Truth-in-Leasing Regulations
49 C.F.R. §376 et seq. and 49 U.S.C. §14704
(Quinn and the Drivers v. Meadow Lark Transport)**

38.    Quinn re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

39.    Under federal law and regulations, "authorized motor carriers" such as Meadow Lark Transport may perform authorized transportation in leased equipment *only* if the equipment lease is in *written* form meeting the requirements set forth in the federal Truth-in-Leasing Regulations at 49 C.F.R. § 376.12. *See* 49 C.F.R. § 376.11.

40.    The Federal Truth-in-Leasing Regulations were passed "to prevent large carriers from taking advantage of individual owner-operators due to their weak bargaining position." *Port Driver s Federation 18, Inc. v. All Saints Express, Inc.*, 2009 WL 3234589 *2 (D.N.J. September 28, 2009).

11

41.     At all times material herein, Meadow Lark Transport was a motor carrier operating in interstate commerce and required to comply with Truth-in-Leasing Regulations under 49 CFR § 376.

42.     At all times material herein, Meadow Lark Transport was an "authorized carrier" within the meaning of 49 C.F.R. § 376.2(a) and a "lessee" within the meaning of 49 C.F.R. § 376.2(g).

43.     At all times material herein, Quinn and the Drivers operated their trucks to the exclusion of all other persons.

44.     At all times material herein, the Drivers were "owners" within the meaning of 49 C.F.R. § 376.2(d), and "lessors" within the meaning of 49 C.F.R. § 376.2(t).

45.     At all times material herein, the arrangement between Meadow Lark Transport and the Drivers was a "lease" within the meaning of 49 C.F.R. § 376.2(e), wherein the Drivers granted use of the equipment to Meadow Lark Transport for use in the regulated transportation of property in exchange for compensation.

46.     At all times material herein, the truck and trailer leased to Meadow Lark Transport by the Drivers were "equipment" within the meaning of 49 C.F.R § 376.2(b).

47.     The arrangement Meadow Lark Transport had with Quinn and the Drivers did not and does not conform to the requirements set forth in the Truth-in-Leasing Regulations making the entirety of the transportation services Meadow Lark Transport provides using Drivers unlawful. 49 C.F.R. § 376.11(a).

48.     Meadow Lark Transport has failed to comply with, and disclose information required by, the Truth-in-Leasing Regulations including, but not limited to:

a.      49 C.F.R. § 376.11(a) (lease must be in writing);

b.      49 C.F.R. § 376.11(a) (receipt for equipment must be given);

c.      49 C.F.R. § 376.12(a) (lease must be signed by parties);

d.      49 C.F.R. § 376.12(b) (lease start and end date specified in writing);

e.      49 C.F.R. § 376.12(c) (lease must provide carrier unqualified exclusive possession, control, and use in writing);

f.      49 C.F.R. § 376.12(d) (compensation to Drivers must be specified in writing);

g.      49 C.F.R. § 376.12(e) (costs/charges and other items to Drivers must be specified in writing);

h.      49 C.F.R. § 376.12(f) (payment period details must be specified in writing);

i.      49 C.F.R. § 376.12(g) (written lease must provide that copies of freight bill or other form of freight rate documentation will be given to Drivers at or before time of settlement and/or permit inspection of such documents, and Drivers must be so advised in writing);

j.  49 C.F.R. § 376.12(h) (all charge-back/deduction items must be specified in writing in the lease together with recitation of method of calculation and advising/affording Drivers copies of validating documents);

k.  49 C.F.R. § 376.12(i) (lease must specify/advise in writing that no products, equipment or services are required to be purchased or rented from authorized carrier and must specify the manner in which carrier may deduct from compensation for any permitted rentals or purchase);

l.  49 C.F.R. § 376.12 (j) (lease must specify/advise in writing all obligations respecting various insurances);

m.  49 C.F.R. § 376.12 (k) (lease must specify/advise in writing various obligations respecting escrows); and

n.  49 C.F.R. § 376.12 (l) (all parties must sign lease and copy must be provided to Drivers to carry on board);

49.  Meadow Lark Transport held Drivers responsible for various claims, fees, costs and penalties. These policies impermissibly limit Meadow Lark Transport's exclusive possession, control and responsibility concerning the operation of the vehicles, in violation of 49 C.F.R. § 376.12(c)(1), and, in several instances, impermissibly seek to limit Meadow Lark Transport's legal obligations concerning public liability insurance under 49 C.F.R. § 376.12(j)(1) and 49 U.S.C. § 13906.

50.    Meadow Lark Transport established an escrow account on behalf of Drivers but did not specifically state the items that this escrow account may be applied to, in violation of 49 C.F.R. § 376.12(k)(2), and failed to pay required interest on such funds.

51.    Meadow Lark Transport withheld Drivers' escrow funds for longer than 45 days from the date of termination, in violation of 49 C.F.R. § 376.12(k)(6).

52.    Meadow Lark Transport required Drivers to pay for various fixed charges on a weekly basis in violation of Meadow Lark Transport's obligation not to require Drivers to purchase any products, equipment or services from Meadow Lark Transport as a condition of entering into the lease, in violation of 49 C.F.R. § 376.12(i).

53.    The conduct and business practice of authorized motor carriers such as Meadow Lark Transport must comply with the Truth-in-Leasing regulations irrespective of whether their written lease agreements satisfy the requirements of the regulations. *See* 49 C.F.R. § 376.12.

54.    The above violations are mere examples of the written lease violating substantial provisions of the Truth-in-Leasing Regulations. Moreover, many of the violations stated herein violate multiple sections of the Truth-in-Leasing Regulations even where only one specific section is cited.

55.    At all times material herein, Meadow Lark Transport was required to have a written lease with the owner or, in this case, the lessees (i.e. Quinn and the Drivers)

with exclusive possession of the leased trucks driven in its fleet that complied with 49 CFR § 376.

56.    At all times material herein, Meadow Lark Transport failed to enter a written lease with Quinn and the Drivers.

57.    Meadow Lark Transport either directly or through the other Meadow Lark companies made unauthorized and unexpected weekly deductions from Quinn's and the Drivers' pay for truck payments, escrow payments, repairs, maintenances, licenses, insurance, and other expenses.

58.    In deducting amounts from the pay of Quinn and the Drivers without having a written lease, Meadow Lark Transport violated the Truth-in-Leasing Regulations, 49 U.S.C. § 14704, and 49 C.F.R. § 376.

59.    Quinn and the Drivers were disadvantaged by the lack of a written contract with Meadow Lark Transport and such conduct caused them significant damages in that had the proposed written lease been presented they would not have agreed to drive for Meadow Lark Transport at all and would not have thus been defrauded out of their labor, deprived of fair compensation for such labor and otherwise subjected to unknown excessive deductions, and forgone other economic opportunities. In other words, Quinn and the Drivers detrimentally relied on Meadow Lark Transport's nondisclosures when deciding to purchase the Driving Opportunity and drive for Meadow Lark Transport and such reliance caused them economic damages.

60.    Quinn and the Drivers were further disadvantaged by a lack of transparency in their contractual relationship with Meadow Lark Transport and such caused damages including under-compensation, improper and excessive deductions, and otherwise significant economic harm. Meadow Lark Transport failed and refused to provide Quinn and the Drivers with documentation that would have confirmed the underpayments, overcharges, otherwise unlawful deductions and failed to advise them in writing of their express regulatory entitlement to such documents. In sum, Quinn and the Drivers were damaged by Meadow Lark Transport violations of the Truth-in-Leasing Regulations and therefore have a viable claim for relief under 49 U.S.C. §14704(a).

## SECOND CLAIM FOR RELIEF

### Violation of the Montana Employee Indemnification Act
### Mont. Code Ann. § 39-2-701
### (Quinn and the Drivers v. Meadow Lark)

61.    Quinn re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

62.    Meadow Lark misclassified Quinn and the Drivers as independent contractors when in fact they were employees of Meadow Lark entitled to the protections of Montana wage and hour laws.

63.    Drivers work regular schedules for Meadow Lark, often 6-7 days per week, and 11-14 hours per day, in order to meet Meadow Lark's service and stand-by

demands. As a result, it is impracticable for Drivers to simultaneously take on any other employment outside of Meadow Lark Transport.

64.    While Meadow Lark purports that Drivers are "independent contractors," it treats them as employees in every material respect. Indeed, the relationship here between Meadow Lark Transport and the Drivers satisfies most of the indicia of employment under Montana law, including but not limited to, for example:

a.    **No Freedom from Control or Direction:**

Meadow Lark Transport controls the performance of Drivers' work under the terms and conditions of service with Meadow Lark Transport. Indeed, Meadow Lark Transport determines the appearance of the truck (including by requiring that all trucks bear the Meadow Lark logo); requires Drivers to operate under Meadow Lark Transport's Department of Transportation operating authority; requires they go Meadow Lark training and orientation; prohibits its Drivers from working for other companies while also working for Meadow Lark Transport; requires that Drivers be "qualified" to work for Meadow Lark Transport; requires Drivers to submit to a background check; controls the limited pool of route assignments available for Drivers; determines the freight being transported and the

customers to whom it is being delivered; fixes Drivers' rate of pay; retains the exclusive right to negotiate prices with the customers; and monitors Drivers' work through its dispatchers, managers and other agents; controls the GPS systems installed in the trucks; and through Drivers' required reporting using the truck's electronic communication system, among other forms of control.

**b.** **Work Performed Within Meadow Lark Transport Facilities and in the Usual Course of their Business:**

Drivers perform work that is firmly within the usual course of Meadow Lark Transport's trucking business and not as an independent business. Meadow Lark Transport is in the business of delivering cargo loads to and from its customers, and the drivers are Meadow Lark Transport's essential labor force for carrying out this core function. Moreover, the Drivers rely on Meadow Lark Transport's network of facilities to retrieve and drop off freight, including Meadow Lark Transport's designated distribution centers and warehouses.

**c.** **No Independently Established Trade, Occupation, Profession or Business:**

Meadow Lark Transport prohibits Drivers from maintaining or advertising an identity separate from Meadow Lark Transport

for services of the same type they were contracted to perform for Meadow Lark Transport. Nor are the Drivers in independently established trades, occupations, professions or businesses. The Drivers work in a job that is synonymous with Meadow Lark Transport's core function of transporting freight and offer no independent trade. Nor are they operating "independent businesses" that advertise services or solicit clients.

d.  **Meadow Lark Transport Supplies the Instrumentalities and Equipment:**

Drivers do not own their trucks, trailers, or other equipment, but rather rely on Meadow Lark Transport's leasing program to acquire the same. Drivers must meet Meadow Lark Transport's strict maintenance and other requirements respecting said equipment. Meadow Lark Transport also requires Drivers to use and pay for Meadow Lark Transport's approved insurance and meeting coverage thresholds prescribed by Meadow Lark Transport.

e.  **Meadow Lark Transport Reserves the Right to Terminate Drivers:**

Meadow Lark Transport retained the right to terminate Drivers on a maximum of seven days' notice without cause, for any

reason, or no reason at all.

65.     Meadow Lark Transport also established work boundaries including imposing fines for violating its policies for failure to meet reporting requirements, failure to abide by set speed limits, unsecured loads, and the like.

66.     Because Quinn and the Drivers are employees, they are entitled to the protections of Montana's employment laws. At issue here are expenses Meadow Lark Transport takes from Quinn and the Drivers for truck payments, trailer payments, computers, fuel, taxes, insurance and other items. Such expenses were necessarily incurred by Quinn and the Drivers as a direct consequence of their duties as a Meadow Lark Transport employee and/or in obedience to Meadow Lark Transport's directions. Consequently, the cost of such items must be borne by Meadow Lark Transport under Mont. Code Ann. § 39-2-701.

### THIRD CLAIM FOR RELIEF

**Constructive Fraud**
**(Quinn and the Drivers v. Meadow Lark)**

67.     Quinn re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

68.     Under Montana law, the tort of constructive fraud consists of "(1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or "(2) any such act or omission as

the law especially declares to be fraudulent, without respect to actual fraud." Mont.
Code Ann. § 28-2-406.

69.     As pertinent here, constructive fraud may arise where the relationship
between the parties is that of buyer and seller, because in a buyer-seller relationship
one party may possess knowledge not possessed by the other and may thereby enjoy a
position of superiority over the other. *McJunkin v. Kaufman & Broad Home Sys.*, 229
Mont. 432, 439-40, 748 P.2d 910, 914-15 (1987). Here, a buyer-seller relationship
existed between the Drivers (the buyers) and Meadow Lark (the sellers) regarding the
Driving Opportunity and all its elements.

70.     Once Meadow Lark embarked on offering, advertising, pitching and
selling the Driving Opportunity to Quinn and all other Drivers, it owed them a duty
of full and truthful disclosure. Here, Meadow Lark breached this duty by concealing
material facts from each Driver that:

a.     Driver turnover was very high at Meadow Lark;

b.     The Driving Opportunity did not present or provide a reasonable
sustained economic opportunity for Drivers;

c.     Drivers that had purchased the Driving Opportunity often failed
within months and lost money;

d.     Drivers that had purchased the Driving Opportunity did not
receive 75 percent of the actual gross revenues from customers

and that Meadow Lark had skimmed additional amounts off the actual gross revenues;

e.     Drivers that had purchased the Driving Opportunity often had weeks where they earned very little or even went negative in their pay;

f.     Meadow Lark Transport did not and would not comply with the Truth-in-Leasing Regulations;

g.     Meadow Lark did not and would not offer written contracts fully disclosing and/or governing the relationship with the Drivers, including terms involving compensation, expenses, duration, and the services Meadow Lark would provide to the Drivers;

h.     Meadow Lark had charged Drivers that had purchased the Driving Opportunity excessive amounts for items such as various types of insurance, fuel tax, escrow fees, and the like and would continue to do so in the future;

i.     Meadow Lark had not and would not pay Drivers fuel surcharges, in whole or in part, to which they were/would be entitled;

j.     Meadow Lark had not and would not pay Drivers interest on escrow accounts to which they were/would be entitled;

k.    Meadow Lark Transport had failed and refused to provide documents and data validating the gross compensation owed to Quinn and the Drivers and would continue to do so in the future;

l.    Meadow Lark Transport failed and refused to provide documents and data validating the expenses and deductions take from Quinn and the Drivers and would continue to do so in the future; and

m.    Meadow Lark Transport imposed working terms and conditions on Quinn and the Drivers that rendered them employees rather than true independent contractors and would continue to do so in the future.

71.    When Meadow Lark omitted the above noted material facts, they intended that Drivers would rely on them in making the decision to purchase the Driving Opportunity, and the Drivers did so.

72.    The undisclosed and true material facts were known only to Meadow Lark and not within the reasonable attention and observation of Quinn and other Drivers that purchased the Driving Opportunity.

73.    Quinn and the putative class relied on such omissions in purchasing the Driving Opportunity. Had Meadow Lark provided the full truth, Quinn and the Drivers would not have purchased the Driving Opportunity.

74.     Quinn and the Drivers suffered damages as a direct result of Meadow Lark's material and omissions in that they paid moneys for the Driving Opportunity, were defrauded out of their labor and full and proper compensation for same, and Meadow Lark gained an unconscionable advantage over them.

75.     In the conduct described above, Meadow Lark acted intentionally with malice and/or with reckless disregard toward the rights of Quinn and the Drivers, entitling Quinn and the putative Class to an award of actual, consequential, and punitive damages under applicable law.

## FOURTH CLAIM FOR RELIEF

**Breach of Contract and Covenant of Good Faith
(Quinn and the Drivers v. Meadow Lark)**

76.     Quinn re-alleges and incorporates the foregoing paragraphs as though fully set forth herein.

77.     Meadow Lark breached its contractual and good faith obligations to Quinn and the Drivers by:

  a.     Failing to pay Quinn and the Drivers 75 percent (or other required percentage) of the actual gross revenue that it received;

  b.     Failing and refusing to provide documents and data supporting the amounts of gross revenue owed to the Drivers;

  c.     Taking unauthorized and excessive charges/deductions from Drivers' compensation;

d.    Failing and refusing to provide documents and data supporting the amounts of charges/deductions taken from Drivers;

e.    Failing and refusing to pay the Drivers accurate fuel surcharges collected from customers;

f.    Acting dishonestly and failing to abide by state and federal laws and regulations (which, by operation of law are incorporated into any contracts with Meadow Lark) in carrying out their obligations to Quinn and the Drivers.

78.    Meadow Lark acted in order to injure the rights of Quinn and the Drivers so as to deprive them of the benefits of the agreements.

79.    Meadow Lark had a legal duty to act honestly, in good faith, and in accordance with federal and state laws and regulations during all contractual negotiations with Quinn and the Drivers and in the performance of their respective obligations.

80.    Meadow Lark breached its legal duties to Quinn and the Drivers and did not otherwise deal in good faith, fairly, or in accordance with federal or state law or regulations for the reasons stated above.

81.    As a result of Meadow Lark's conduct, Quinn and the Drivers have suffered damages. Meadow Lark is required to compensate, reimburse, and make Quinn and the Drivers whole for any and all compensation and benefits they would have received had it not been for its illegal actions.

## FIFTH CLAIM FOR RELIEF

### Unjust Enrichment
### (Quinn and the Drivers v. Meadow Lark)

82.    Quinn and the Drivers re-allege and incorporate by reference all allegations in all preceding paragraphs.

83.    To the extent no enforceable contracts exist, in whole or in part, to regulate the panoply of obligations between Quinn and the Drivers on the one hand and Meadow Lark on the other hand, Meadow Lark was unjustly enriched by Quinn and the Drivers as (1) Quinn and the Drivers conferred benefits on Meadow Lark by providing it driving services and paying expenses on its behalf; (2) Meadow Lark appreciated and knew of such benefits; and (3) Meadow Lark accepted and retained such benefits under such circumstances as to make it inequitable for Meadow Lark to retain the benefits without payment of their full value. Additionally, Meadow Lark withheld money it knew or should have known it was not entitled to.

84.    Meadow Lark Transport's unjust enrichment caused Quinn and the Drivers to suffer damages and financial losses including, among other things, loss of wages and interest thereon, and assuming debt and expense obligations inherent in the Driving Opportunity.

85.    Quinn and the Drivers are entitled to restitution of all benefits conferred upon Meadow Lark Transport, including but not limited to, the disgorgement of any unjust profits.

## **PRAYER FOR RELIEF**

WHEREFORE, Quinn on behalf of himself and the Drivers prays for relief as follows:

a.    For damages and restitution according to proof at trial for all injuries;

b.    For a declaratory judgment that Meadow Lark has violated federal Montana law and public policy as alleged herein;

c.    For preliminary, permanent, and mandatory injunctive relief prohibiting Meadow Lark, their officers, agents, and all those acting in concert with them from committing in the future those violations of law herein alleged;

d.    For an order awarding Quinn and the Drivers compensatory damages, including restitution, recovery of all money and other valuable consideration paid for the Driving opportunity, actual damages, and all other sums of money owed to Quinn and the Drivers, together with interest on these amounts, according to proof;

e.    For an order awarding Quinn and the Drivers civil penalties pursuant to Montana law, with interest thereon;

f.    For an award of reasonable attorneys' fees as provided by Montana and federal law;

g.    For all costs of suit;

h.    For interest on any damages and/or penalties awarded, as provided by applicable law; and

i.    For such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Quinn hereby demands a jury trial on all claims and issues for which Quinn is entitled to a jury.

Dated: <u>June 2, 2022</u>          Respectfully submitted,

  <u>/s/ Scott Peterson</u>
John Morrison
Scott Peterson
MORRISON, SHERWOOD,
WILSON, & DEOLA, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
ph. (406) 442-3261
fax (406) 443-7294
john@mswdlaw.com
speterson@mswdlaw.com

Robert S. Boulter (*pro hac vice* to be submitted)
LAW OFFICES OF ROBERT S. BOULTER
1101 5th Ave #310
San Rafael, CA 94901
Tel: (415) 233-7100
rsb@boulter-law.com

***Attorneys for Quinn and the Putative Class***