John Morrison
Scott Peterson
MORRISON, SHERWOOD, WILSON, & DEOLA, PLLP
401 N. Last Chance Gulch St.
Helena, MT 59601
ph. (406) 442-3261
fax (406) 443-7294
john@mswdlaw.com
speterson@mswdlaw.com

Robert S. Boulter
LAW OFFICES OF ROBERT S. BOULTER
1101 5th Ave #310
San Rafael, CA 94901
ph. (415) 233-7100
rsb@boulter-law.com

*Attorneys for Plaintiff Matthew Quinn*

# UNITED STATES DISTRICT COURT
# DISTRICT OF MONTANA - BILLINGS DIVISION

| | |
|---|---|
| MATTHEW QUINN, an individual, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>MEADOW LARK TRANSPORT, INC., MEADOW LARK COMPANIES, INC., MEADOW LARK AGENCY, INC.,<br><br>Defendants. | Cause No: CV-22-55-BLG-SPW-TJC<br><br><br><br>**BRIEF IN SUPPORT OF UNOPPOSED MOTION FOR CLASS CERTIFICATION AND PARTIALLY OPPOSED MOTION FOR DEFAULT JUDGMENT** |

1

Plaintiff respectfully submits this memorandum brief in support of his Motion for Class Certification and Default Judgment against Defendants Meadow Lark Transport and Meadow Lark Companies, Inc., in the amount of $15 million. As of today, Plaintiff has learned through Meadow Lark Agency bankruptcy counsel Andy Patten that Amanda Roth, owner of the Meadow Lark Defendant entities, does not oppose the Motion for Class Certification or the Motion for Default Judgment as to Meadow Lark Companies, but does oppose the motion for default judgment as to Meadow Lark Transport. The briefing below was prepared before Plaintiff heard from Ms. Roth. Although the motions are largely unopposed now, and although it is unclear whether Ms. Roth can oppose the motion as to Transport in the absence of counsel, the briefing below is provided to the extent that the Court finds it useful.

## Background

Plaintiff's complaint in this case was filed June 2, 2022. Doc. 1. The Complaint seeks certification of a class of truck drivers who were lured into a relationship with Defendants in which they were led to believe they would be independent business owners with attractive financial prospects. Instead, their conduct was tightly controlled, and they were forced to bear Meadow Lark's expenses, which gutted their income and resulted in a mass exodus of drivers. The Complaint asserted claims for violation of The Truth-in-Leasing Regulations

(Count I), violation of the Montana Employee Indemnification Act (Count II), constructive fraud (Count III), breach of contract and the implied covenant of good faith and fair dealing (Count IV), and unjust enrichment (Count V). The putative class was defined as:

> All current and former Drivers who leased trucks and drove for Meadow Lark and had deductions taken from their compensation for a truck lease payment in any week within the United States at any time during the period beginning five years prior to the filing of this Complaint and continuing through the resolution of this action. Doc. 1 ¶ 28.

In December 2022, Plaintiff took the deposition of Meadow Lark COO, Mike Kandas. In mid-August of 2023, Plaintiffs took Meadow Lark's 30(b)(6) deposition. The witnesses Meadow Lark produced to give testimony on behalf of the company were Stacey Collett (vice president of compliance) and Nikki Bassette (executive vice president.)

Plaintiff learned in discovery that the employees of Meadow Lark worked for Meadow Lark Agency. The business of Meadow Lark, including all the shipping transactions and contracts with drivers, was done through Meadow Lark Transport. Meadow Lark Companies, Inc. is the parent company of Transport and Agency.

The deposition testimony revealed widespread improper corporate conduct designed to shift costs on to unwitting drivers and unjustly enrich Meadow Lark. In summary, the company went from roughly 65 drivers to 500 drivers and back to

120 drivers in a period of three years. This occurred because of the misrepresentations and concealment that are at issue in this case, which were made through advertisements, manuals, emails, and other uniform communications to drivers. The scheme involved a circular leasing arrangement, by which trucks were leased by Meadow Lark to non-employee drivers who were required to lease the trucks back to Meadow Lark and then drive them for the company (with the Meadow Lark brand on the door) while being told they were "owner-operators." The same drivers were then billed for everything from their truck lease to fuel to insurance to repairs while being watched on required cameras, being forced to submit detailed logs, and being prohibited from driving for anyone or serving customers in competition with Meadow Lark. After a period of months, the duped drivers would discover that Meadow Lark's glowing promises of financial opportunity for "owner-operators" was a sham, and they left the company in droves. Meadow Lark's turnover rate went from 3% in 2017 to more than 50% in 2018 because of the scheme, meaning 50-60% percent of the drivers quit within a year of signing.

     The 30(b)(6) testimony also showed, *inter alia*: that 1) Company owner and CEO Mandy Roth unilaterally and without disclosure appropriated for Meadow Lark a greater share of the fuel discount that had been negotiated with fuel providers and given to drivers, who had to pay for the fuel—this increased drivers'

fuel costs by a specific, significant amount while unjustly enriching Meadow lark by the same amount; 2) extra charges were imposed on drivers for safety violations even when they did not get tickets; 3) Meadow Lark made unilateral at-fault determinations to shift the cost of vehicle repairs to the drivers; and 4) Meadow Lark began withholding revenue for insurance premiums midstream, which reduced the gross against which drivers' agreed upon percentages applied and therefore the drivers income. The mass exodus of drivers reflected the impropriety of the program.

On November 6, 2023, Meadowlark Agency filed Chapter 7 bankruptcy. To date, neither of the other named Defendants has filed a bankruptcy petition.

## Default Judgement

In its December 8, 2023, Order, this Court set a show cause hearing for January 12, 2024, at which Defendants Meadow Lark Transport, Inc. and Meadow Lark Companies, Inc. must show cause why they should not be held in default for failing to comply with the Court's Order. This Court further ordered that failure to comply may subject these Defendants to sanctions as permitted by Fed. R. Civ. P. 16(f), including entry of default judgment.

Rule 16(f), Fed. R. Civ. Pro., allows the Court to impose sanctions for a party's failure to appear, including those listed in Rule 37(b)(2)(A)(iv), "rendering a default judgment against the disobedient party."

A default judgment by the Court in this case would be consistent with other Courts that have sustained actions like this under various theories including misclassification and misrepresentation-based torts. See *Roberts v. C.R. England, Inc.*, 318 F.R.D. 457 (D. Utah 2017); *Huddleston v. John Christner Trucking, LLC*, 2020 U.S. Dist. LEXIS 15444 (N.D. Okla. Jan. 30, 2020); *Elmy v. Western Express, Inc.* 2021 U.S. Dist. LEXIS 139695 (M.D. Tenn. July 27, 2021).

Plaintiff respectfully asks the Court to certify the class, on grounds discussed below, and *after certification*, to enter the default judgment on behalf of Plaintiff and the Class.

## Class Certification

*As noted above, the motion for class certification is now not opposed*. However, there are also clear grounds for certification. The deposition testimony and documents demonstrate that the issues here are systemic and programmatic making this a classic case for class treatment. Meadow Lark exercised control through company-wide policies that applied to all drivers. The deductions were the same for all class drivers varying only as to the vehicle and contract option they chose. (These differences only affect the damages due to each class member, which does not provide a basis for denying class certification.) Similarly, the representations were made in advertisements, website pages, and email

6

communications that were directed equally to all class drivers. For these reasons, ample commonality exists for class certification.

This case also concerns the same form contract, and whether that contract violates the federal truth-in-leasing regulations. This form contract makes this case ideal for class adjudication. As the First Circuit has observed, "Several federal courts have certified classes for contract disputes over form contracts because the form contracts are interpreted uniformly across members of the class, and thus the outcome does not depend on extrinsic evidence that would be different for each putative class member." *Kolbe v. BAC Home Loans Servicing, LP*, 738 F.3d 432, 441 (1st Cir. 2013). The Eleventh Circuit has likewise observed, "It is the form contract, executed under like conditions by all class members, that best facilitates class treatment." *Sacred Heart Health Systems, Inc.v. Humana Military Healthcare*, 601 F.3d 1159, 1171 (11th Cir. 2010) And the Third Circuit has similarly stated, "federal courts have recognized that claims involving the interpretation of standard form contracts are particularly well-suited for class treatment." *Gillis v. Respond Power, LLC*, 677F. App'x 752, 756 (3d Cir. 2017).

Similarly, the representations made by Meadow Lark to the drivers were made through the same marketing and training materials in an identical way to all drivers and relied on by the drivers in the same way—accepting the positions and providing labor to Meadow Lark until their departure from the company. The

costs improperly imposed by Meadow lark on the drivers were likewise imposed in an identical way as to all drivers. Thus, calculating the amounts owed by Meadow Lark to the class is simply a matter of math.

Unsurprisingly, then, all the Rule 23(a) factors are satisfied here. Numerosity (Rule 23(a)(1)) is easily satisfied here as Meadow Lark has produced a list of approximately 750 drivers which Meadow Lark testified represented are class members. Morrison Declaration Exhs. # 1, 2 (MTL 4085-4097; Collett depo. 88:20-25)

Commonality under Rule 23(a)(2) exists because the case concerns questions of the same form contract containing the same terms. *Sacred Heart*, 601 F.3d at 1171; Collett depo. at 174-176, 191. Any changes to the contracts were the same for all class drivers. *Id.* at 195. This means, inter alia, that each contract driver has the same responsibilities, is subject to the same Meadow Lark policies, and Meadow Lark charges the drivers the same price for the same items and services. The drivers all received the same orientation and initial packet (*Id.* at 79), were subject to the same key performance indicators (*Id.* at 82), received the same safety and compliance manual (*Id.* at 100), were subject to the same onboarding and reporting requirements (*Id.* at 101-103),were required to undergo the same inspections (*Id.* at 114-115), were covered under the same insurance (*Id.* at 147), were required to use the same electronic logging device (*Id.* at 106-107), received

8

the same emails, and were subject to the same non-compete clauses. *Id.* at 154-155. And most importantly for determination of class relief, all drivers were subject to the same deductions from their weekly pay. *Id.* at 170, 195-197, 241.

For similar reasons, Matthew Quinn's claims are typical here of the class as (like every other class member) he was (1) a non-employee driver who (2) rented a truck from Meadow Lark. Adequacy is also present as Matthew Quinn fits within the proposed class definition. And class counsel is also adequate as this Court has previously found both Mr. Morrison and Mr. Peterson as qualified class counsel in *Butler v. Unified Life Ins. Co.*, 2019 U.S. Dist. LEXIS 170604, 2019 WL 5302500, 12*.

Federal Rule 23(b)(3) is also satisfied because the legal issues here predominate over any individual issues. This includes questions of whether the contract drivers were employees and not independent contractors, whether Meadowlark's form contract violated federal law, and whether the amounts that Meadow Lark deducted from the drivers' pay were the responsibility of Meadow Lark and were wrongly billed to the drivers. There are no individual issues because each of these drivers were subject to the same systematic policies and procedures, the same form contract, and received the same misrepresentations.

Even the damages are similar because the alleged harm Meadow Lark caused is the same—forcing the "owner-operator" drivers to pay out-of-pocket

costs that Meadow Lark was responsible for. As discussed below, these amounts are subject to economic calculation while the amount each class member is awarded may be different, the 9th Circuit is clear that variations in damages alone does not affect certification. *Leyva v. Medline Indus. Inc.*, 716 F.3d 510 (9th Cir. 2013) (quoting *Yokoyama v. Midland Nat'l Life Ins. Co*., 594 F.3d 1087, 1094 (9th Cir. 2010)). This rule is "well settled" within the Circuit's precedent. *Vaquero v. Ashley Furniture Indus*., 824 F.3d 1150, 1155 (9th Cir. 2016). All that is required is that class members experienced similar harm, which exists here through Meadow Lark illegally designating the drivers as "independent contractors" and thereby, passing along costs that were Meadow Lark's responsibility.

For all these reasons, a class action presents the superior method for adjudicating this matter. There are no individualized questions. And rather than 750 drivers each litigating their claim in 750 different matters, the entire matter can be addressed in a single case.

## Damages

Plaintiffs' liability claims share the same core body of damages. Namely, the amounts that were wrongfully deducted from the "owner-operators'" weekly pay. There are approximately 750 class members. Meadow Lark has provided in discovery answers a chart identifying all these class members.  Meadow Lark also provided in discovery all the documents showing the amounts that were deducted

from Plaintiff Matthew Quinn's weekly pay. From these numbers we can extrapolate a reasonable calculation of the damage that is owing to the class.

Approximate total driver weeks in the program is 23,200. Approximate average tenure across the class is 31 weeks. Quinn drove for 56 weeks. During that period, the major expenses that Meadow Lark should have born itself, and the corresponding class-wide damages, are as follows:

| **Expense** | **Total** | **Weekly** | **Classwide Extrapolation** |
|---|---|---|---|
| Admin Fee | -$300.00 | -$5.36 | -$124,285.71 |
| Net Fuel Charges[1] | -$20,444.29 | -$365.08 | -$8,469,777.29 |
| Fuel Tax | -$1,375.00 | -$24.55 | -$569,642.86 |
| Inspection Deduction | -$350.00 | -$6.25 | -$145,000.00 |
| Insurance Pool High % Lease | -$735.00 | -$13.13 | -$304,500.00 |
| Physical Damage Insurance | -$3,723.90 | -$66.50 | -$1,542,758.57 |
| OwnerOp Misc | -$7,075.27 | -$126.34 | -$2,931,183.29 |
| Omni Service | -$550.00 | -$9.82 | -$227,857.14 |
| Reserve OwnerOp | -$2,150.00 | -$38.39 | -$890,714.29 |
| Standard Deductions No Plate | -$3,800.00 | -$67.86 | -$1,574,285.71 |
| Standard Deductions + Plate | -$2,550.00 | -$45.54 | -$1,056,428.57 |
| Trailer Pool | -$10,175.00 | -$181.70 | -$4,215,357.14 |
| Tractor Ryder[2] | -$31,350.00 | -$559.82 | -$12,987,857.14 |
|  |  |  |  |
| Total Damages |  |  | -$35,039,647.71 |

---

[1] These are fuel charges less the fuel surcharge paid to Quinn.
[2] This includes the 6k paid to Deaton when he switched over to leasing from Deaton.

Cases like this have been settled across the country for millions of dollars each.³

The settlements below range from $11,620.60 per driver to $34,974 per driver. At $20,000 per driver, the common fund in this case would be $15,000,000.

Plaintiff recognizes that defendants have significant financial limitations. At the same time, certain financial resources may be available to satisfy a judgment, whether in this proceeding or in the bankruptcy court. Plaintiffs respectfully ask the court to enter default judgment in the amount of **$15 million**, which falls well within the range of case settlements in this area and far less than the potential damages that Plaintiff and the Class will ultimately be able to prove.

Dated this 10th day of January, 2024.

By:  /s/ John Morrison
John Morrison

---

³ See, e.g., *Taylor v. Shippers Transp. Express, Inc*., 2015 U.S. Dist. LEXIS 191461 (C.D. Cal. May 14, 2015) (Settlement of $11,040,000 on behalf of 540 drivers, for an average gross recovery of $20,444.44 per driver); *Singh v. Roadrunner Intermodal Servs., LLC*, 2018 U.S. Dist. LEXIS 89308 (E.D. Cal. May 25, 2018) (Settlement of $9,250,000 on behalf of 796 drivers, for an average recovery of $11,620.60 per driver); *Badia v. HomeDeliveryLink, Inc*., 2015 U.S. Dist. LEXIS 129033 (D.N.J. Sept. 25, 2015) ("The Settlement provides an average payout of $11,137 to Contractors"); *Duy Nam Ly et al. v. J.B. Hunt Transport Inc*., Case No. 2:19-cv-01334 (E.D. Cal. July 2020) (Settlement of $6,500,000 on behalf of 312 drivers, for an average gross recovery of $20,833.33 per driver); Carter v. XPO Logistics, Inc., 2019 U.S. Dist. LEXIS 181017 (N.D. Cal. Oct. 18, 2019) (Settlement of $16,500,000 on behalf of 832 drivers, for an average gross recovery of $19,831.73 per class member); *In re FedEx Ground Package Sys*., No. 3:05-MD-527 RLM (MDL 1700) (Settlement of $227,000,000 on behalf of 12,627 independent contractors across 19 states, for an average gross recovery of $17,977.35 per driver); *Villalpando v. Excel Direct, Inc.*, Case No. 3: 12-cv-04137- JCS (N.D. Cal. 2016) (Settlement of $13,500,000 on behalf of 386 drivers, for an average gross recovery of $34,974.09 per driver).

*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 11th day of January, 2024, a true copy of the foregoing was served by U.S. Mail, first class, postage prepaid, to the following:

Amanda Roth
MEADOW LARK COMPANIES
MEADOW LARK AGENCY
MEADOW LARK TRANSPORT
2913 Millennium Cir
Billings, MT 59102

James A. "Andy" Patten
PATTEN, PETERMAN, BEKKEDAHL & GREEN PLLC
2817 2nd Ave N #300
Billings, MT 59101

By: _____
Amy Kirscher