IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| MATTHEW QUINN, an individual, individually and on behalf of all others similarly situated,<br><br>       Plaintiff,<br><br>vs.<br><br>MEADOW LARK TRANSPORT, INC.; MEADOW LARK COMPANIES, INC.; MEADOW LARK AGENCY, INC.; AMANDA ROTH; MIKE KANDAS; RON USEM; HUFFMAN, USEM, CRAWFORD, GREENBERG & SMITH, P.A.,<br><br>       Defendants. | CV 22-55-BLG-SPW-TJC<br><br><br>**FINDINGS AND RECOMMENDATIONS OF U.S. MAGISTRATE JUDGE** |

Defendants Huffman, Usem, Crawford, Greenberg & Smith, P.A. ("HUCGS") and Ron Usem ("Usem") (collectively "Defendants") have filed a Renewed Motion To Dismiss.  (Doc. 96.)  The motions are fully briefed and ripe for the Court's review.  (*See* Docs. 97, 102, 105.)

For the following reasons, the Court recommends that Defendants' Renewed Motion To Dismiss be GRANTED in part and DENIED in part.

/ / /

/ / /

1

## I.    BACKGROUND

The following facts are taken from Quinn's Class Action Second Amended Complaint ("SAC").[1]  From approximately June 2020 to June 2021, Quinn performed work as a truck driver for Meadow Lark Transport, Inc., Meadow Lark Companies, Inc., and/or Meadow Lark Agency, Inc. (collectively "Meadow Lark"). (Doc. 91 at 4.)  At all material times, Amanda Roth and Mike Kandas were the chief executive officer and chief operating officer of Meadow Lark, respectively. (*Id.* at 6.)  Quinn alleges that Roth and Kandas decided to adopt a so-called owner-operator, full-service lease model of business (hereinafter "Lease Program").  Under the Lease Program, Meadow Lark leased trucks from third parties; Meadow Lark sub-leased those trucks to certain drivers; and the drivers then leased the trucks back to Meadow Lark. (*Id.* at 6–8.)

Quinn alleges that the Lease Program constituted a "fraudulent scheme," because Meadow Lark represented to truck drivers that they would be independent "owner-operators" but, instead, were "completely under the control of Meadow Lark, as Meadow Lark shifted its costs of operation onto the drivers." (Doc. 91 at

---

[1] When considering a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court must accept all material allegations in the complaint as true. *Usher v. City of L.A.*, 828 F.2d 556, 561 (9th Cir. 1987). Further, in ruling on a motion to dismiss under Rule 12(b)(2), "the court must accept uncontroverted allegations in the plaintiff's complaint as true and resolve all disputed facts in favor of the plaintiff." *Caldrone v. Circle K Stores, Inc.*, 2021 WL 6496746, at *3 (C.D. Cal. Aug. 2, 2021) (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124, 1127 (9th Cir. 2010)).

8.)  Quinn's allegations include that Meadow Lark induced drivers to join its fleet using misrepresentations, then deducted excessive amounts from the drivers' pay, all while treating the drivers as independent contractors in contravention of Montana employment law.  (*Id.* at 32, 43–44.)

At all material times, attorney Ron Usem represented and advised Meadow Lark regarding the Lease Program.  (Doc. 91 at 6.)  Quinn alleges that Usem and his law firm, HUCGS, advised Meadow Lark on how to structure the Lease Program and drafted the contracts and other documents, which allowed the program to be implemented.  (*Id.* at 44.)  Quinn alleges that Defendants performed these services for Meadow Lark knowing they were participating in an illegal scheme.  (*Id.*)

Quinn brings six causes of action against various defendants.  Relevant to the pending motion to dismiss are those claims against HUCGS and Usem: constructive fraud (Count III), unjust enrichment (Count V), and joint tortious enterprise (Count VI).  Defendants move to dismiss Quinn's SAC pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure, asserting that the Court lacks personal jurisdiction over them, and that the SAC fails to state a claim against them upon which relief can be granted.  (Doc. 96 at 2.)

/ / /

/ / /

3

## II.    LEGAL STANDARDS

### A.    Rule 12(b)(2)

A defendant may move to dismiss a complaint under Rule 12(b)(2) of the Federal Rules of Civil Procedure if the court lacks personal jurisdiction over the defendant.  When the defendant moves to dismiss a claim on those grounds, the plaintiff bears the burden of proving that the requirements for personal jurisdiction are satisfied.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004).

When the motion is based on written materials, rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts. *Schwarzenegger*, 374 F.3d at 800.  In determining whether it has personal jurisdiction, however, courts may consider declarations and other evidence outside the pleadings.  *First Nat'l Bank v. Estate of Carlson*, 448 F. Supp. 3d 1091, 1096 (D. Mont. 2020).  A court's duty is to inquire into whether the plaintiff's pleadings and affidavits make a prima facie showing of personal jurisdiction, accepting the plaintiff's allegations as true.  *Schwarzenegger*, 374 F.3d at 800.  Further, any "[c]onflicts between parties over statements in affidavits must be resolved in the plaintiff's favor."  *Id.*

/ / /

/ / /

4

**B.    Rule 12(b)(6)**

Rule 12(b)(6) of the Federal Rules of Civil Procedure governs a motion to dismiss for failure to state a claim upon which relief can be granted.  "Dismissal under Rule 12(b)(6) is proper only when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Zixiang Li v. Kerry*, 710 F.3d 995, 999 (9th Cir. 2013).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 6778 (2009) (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  "[I]n practice, a complaint . . . must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007) (quoting *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1984)).

A court considering a Rule 12(b)(6) motion must accept as true the allegations of the complaint and must construe those allegations in the light most favorable to the nonmoving party.  *See, e.g.*, *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir. 1998).  However, "bare assertions . . .

amount[ing] to nothing more than a 'formulaic recitation of the elements' . . . for the purposes of ruling on a motion to dismiss, are not entitled to an assumption of truth." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (quoting *Twombly*, 550 U.S. at 555). Such assertions do nothing more than state a legal conclusion, even if the conclusion is cast in the form of a factual allegation. *Id.*

## III.    DISCUSSION

The Court will first address whether it can exercise personal jurisdiction over Defendants. *See Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999) ("[J]urisdiction generally must precede merits in dispositional order.").

### A.    Lack of Personal Jurisdiction

Where subject matter jurisdiction is based on diversity, "a federal court applies the personal jurisdiction rules of the forum state provided the exercise of jurisdiction comports with due process." *Scott v. Breeland*, 792 F.2d 925, 927 (9th Cir. 1986). Thus, to exercise personal jurisdiction over a non-resident defendant in a diversity case, a federal court must make the following determinations: (1) whether an applicable state rule or statute confers personal jurisdiction over the defendant; and (2) whether the assertion of jurisdiction comports with constitutional principles of due process. *Data Disc, Inc. v. Sys. Tech. Assocs.*, 557 F.2d 1280, 1286 (9th Cir. 1977).

/ / /

Montana's long-arm statute is found in Rule 4(b)(1) of the Montana Rules of Civil Procedure, and provides, in part, as follows:

> All persons found within the state of Montana are subject to the jurisdiction of Montana courts. Additionally, any person is subject to the jurisdiction of Montana courts as to any claim for relief arising from the doing personally, or through an employee or agent, of any of the following acts:
> (A) the transaction of any business within Montana;
> (B) the commission of any act resulting in accrual within Montana of a tort action . . . .

Mont. R. Civ. P. 4(b)(1)(A)–(B). The Montana Supreme Court has described the first sentence of Rule 4(b)(1) as establishing the requirements for general jurisdiction, with the remainder establishing the requirements for specific jurisdiction. *Cimmaron Corp. v. Smith*, 67 P.3d 258, 260 (Mont. 2003).

General personal jurisdiction is premised on a defendant's relationship to the forum state. *Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct.*, 443 P.3d 407, 412 (Mont. 2019), *aff'd*, 592 U.S. 351 (2021). "A court with general jurisdiction may hear *any* claim against that defendant, even if all the incidents underlying the claim occurred in a different state." *Bristol-Myers Squibb Co. v. Sup. Ct. of Cal.*, 582 U.S. 255, 262 (2017) (emphasis in original). To establish general jurisdiction over a defendant, the defendant's affiliations with the state must be "so 'continuous and systematic' as to render them essentially at home in the forum state." *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)). A natural person is generally "at home" in the state of their

7

domicile. *Daimler*, 571 U.S. at 137. A corporate defendant is generally "at home" at its place of incorporation and its principal place of business. *Tyrrell*, 581 U.S. at 413; *DeLeon v. BNSF Ry. Co.*, 426 P.3d 1, 4–5 (Mont. 2018). In exceptional cases, however, a corporation may also be at home where its activities in another forum "may be so substantial and of such a nature as to render the corporation at home in that State." *Daimler*, 571 U.S. at 139.

Specific personal jurisdiction, on the other hand, is premised on both the defendant's relationship to the forum and the cause of action. *Ford Motor Co.*, 443 P.3d at 412. Specific jurisdiction is more limited and requires the controversy to be directly related to the defendant's contacts with the forum. *Bristol-Myers*, 582 U.S. at 262. If specific jurisdiction is found, then it must be determined whether exercising jurisdiction over the defendant would be consistent with the defendant's due process rights under federal law. *Gateway Hosp. Grp. Inc. v. Phila. Indem. Ins. Co.*, 464 P.3d 44, 52 (Mont. 2020).

### 1. General Jurisdiction

Defendants argue they are not subject to general jurisdiction in this forum because they cannot be "found within" Montana, as required by the long-arm statute. (Doc. 97 at 11–13.)

As to HUCGS, Defendants point out that HUCGS is not incorporated in Montana and does not maintain its principal place of business in Montana. (Doc.

105 at 4.)  Quinn does not present arguments to the contrary but contends that HUCGS is subject to general jurisdiction in Montana because the firm "has been the all-purpose legal counsel for a Billings based company, meeting with the company management in Montana," and helping Meadow Lark develop the Lease Program business model at the center of this action.  (Doc. 102 at 16.)  But these affiliations with Montana are certainly not so systematic and continuous as to render HUCGS at home in the state.  These allegations may be relevant to whether HUCGS has sufficient contacts in Montana for purposes of specific jurisdiction, but they do not establish that the firm is "found within" Montana or otherwise "at home" in the state.

As to Usem, Quinn does not argue that Usem is at home in Montana. Instead, Quinn argues that Usem is subject to general jurisdiction because he "travelled to Montana and met with Meadow Lark management as part of the representation" and performed ongoing legal work on behalf of Meadow Lark. (Doc. 102 at 16.)  Similar to Quinn's allegations against HUCGS, these facts may be relevant to whether Usem has sufficient contacts in Montana for purposes of specific jurisdiction, but they do not establish that Usem is "found within" Montana.

Accordingly, Quinn has not shown that either Usem or HUCGS are subject to general jurisdiction in Montana.

### 2.    Specific Jurisdiction

### a.    Whether the Long-Arm Statute Confers Jurisdiction Over Claims Against Defendants

In the absence of general jurisdiction, Rule 4(b)(1) provides several avenues whereby Montana courts can nevertheless assert personal jurisdiction over the plaintiff's specific claims against a defendant.  Relevant here is the applicability of subdivisions (b)(1)(A) ("the transaction of any business within Montana") and (b)(1)(B) ("the commission of any act resulting in accrual within Montana of a tort action").  The Court will address each of these provisions in turn.

### i.    Transaction of Business Within Montana

Defendants argue that their dealings with Meadow Lark were not the result of expanding the firm's practice into Montana, but came about because "HUCGS was contacted by Meadow Lark for assistance in preparing contracts which complied with federal laws given Usem's expertise in this area of federal law . . . ." (Doc. 97 at 20.)  Defendants further contend that they have no connection to Quinn or other members of the putative class.  (*Id.*)  In response, Quinn argues that Defendants' conduct satisfies the "transaction of any business within Montana" provision of the long-arm statute because "they are in the *business* of providing legal counsel—particularly to transportation companies."  (Doc. 102 at 16–17.)

Rule 4(b)(1)(A) requires "far fewer contacts with the forum state than are necessary to support general jurisdiction on the theory that the defendant is 'doing

business' in the forum state." *Milky Whey, Inc. v. Dairy Partners, LLC*, 342 P.3d 13, 18 (Mont. 2015) (quoting 4A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*, Civil 3d § 1069.2 (2002)). Nevertheless, the Montana Supreme Court has stated that there still must be "substantial interactions occur[ring] in Montana." *Id.* at 19.  For example, merely entering into a contract with a Montana resident does not subject a non-resident to jurisdiction. *Cimmaron*, 67 P.3d at 260–61.  "Even extensive interstate communications . . . do not give rise to jurisdiction where the contract is to be performed in another state." *Milky Whey*, 342 P.3d at 19.  This is because "interstate communication is an almost inevitable accompaniment to doing business in the modern world, and cannot be itself be considered 'contact' for justifying the exercise of personal jurisdiction." *Cimmaron*, 67 P.3d at 261 (citing *Edsall Constr. Co. Inc. v. Robinson*, 804 P.2d 1039, 1042 (Mont. 1991)).

Further, it is well established that "a defendant must be haled into court in a forum state 'based on his own affiliation with' the state, not based on the unilateral activity of a plaintiff or on the random fortuitous, or attenuated contacts the defendant has with other persons affiliated with the state." *Tackett v. Duncan*, 334 P.3d 920, 928–29 (Mont. 2014) (quoting *Walden v. Fiore*, 571 U.S. 277, 286 (2014)).

/ / /

11

For example, an out-of-state company's business dealings with a Montana company do not constitute the transaction of business within Montana under Rule 4(b)(1)(A) when the defendant has never sold products or engaged in the performance of services in Montana, does not have any offices or solicit any business in Montana, and has never sent any representatives to Montana to negotiate contracts or executed written contracts in the state. *Milky Whey*, 342 P.3d at 18. In *Milky Whey*, a Montana dairy broker contracted with a Minnesota dairy supply company to purchase its products and pick them up at the defendant's warehouse in Utah, but the shipment spoiled before the plaintiff arrived. *Id.* at 15. The court noted that none of the acts or omissions giving rise to plaintiff's claims arose from the Minnesota defendant's purposeful engagement in activities in Montana, even if the Montana company had purchased the defendant's products. *Id.* at 20. Further, nothing connected the defendant to Montana, save its telephone, fax, and email communications with the plaintiff. *Id.* at 17. The court rejected the argument that the companies' long-standing business relationship carried weight, given that "all of the claims in [the plaintiff's] complaint arose from its discovery of moldy cheese in Utah." *Id.* at 19. Therefore, the defendant's "suit-related conduct did not create a substantial connection with the forum State," and Montana's courts lacked personal jurisdiction over the defendant under Rule 4(b)(1)(A). *Id.* at 20–21 (alteration omitted).

12

The Montana Supreme Court also recently held that out-of-state lawyers did not engage in the transaction of business in Montana when they worked on a legal matter out-of-state, gave advice to the client out-of-state, and never traveled to Montana, made an appearance in Montana, or communicated with anyone in Montana. *Phila. Indem. Ins. Co. v. O'Leary*, 557 P.3d 946, 954 (Mont. 2024).  In that case, a pair of California lawyers advised their client, a Pennsylvania insurance company, to deny coverage to an Ohio corporation for defense and indemnification in a Montana lawsuit. *Id.* at 948.  The Ohio corporation sued the lawyers' client (the insurer) in Montana for breach of the insurance contract, and the insurer brought claims against the lawyers for legal malpractice.  *Id.* at 948–49.  The court called into question its prior holdings that the business activity in Montana must be "substantial" to satisfy Rule 4(b)(1)(A), given that the text of the long-arm statute permits jurisdiction when the defendant transacts "any business" in Montana. *Id.* at 954, 954 n.1.  Nevertheless, because the insurer had indeed failed to establish that the lawyers transacted *any* business in Montana related to the claims against them, even a more liberal interpretation of Rule 4(b)(1)(A) would not have allowed jurisdiction.

Here, the Count finds that, in contrast to defendants in the above cases, both Usem and HUCGS transacted business within Montana for the purposes of Rule 4(b)(1)(A).  It is uncontested that (1) Defendants are in the business of providing

13

legal services; (2) they provided those legal services to a client located in Montana over a span of 11 years; (3) the scope of those services included traveling to Montana on at least one occasion and providing some of those services within Montana; (4) they drafted the contract documents to effect the implementation of the Lease Program in Montana; (5) the impact of those legal services were felt in Montana, and (6) the causes of action asserted against Defendants arise from those legal services. These facts are sufficient to establish that Quinn's claims for relief arise out of Defendants' transaction of business within the state.

Accordingly, Quinn has established that Rule 4(b)(1)(A) authorizes the exercise of personal jurisdiction over Quinn's claims against Defendants.

### ii. Commission of an Act Resulting in Accrual of a Tort Action

Rule 4(b)(1)(B) provides jurisdiction over any person "as to any claim for relief arising from . . . the commission of any act resulting in accrual within Montana of a tort action . . . ." In arguing that this subdivision of the long-arm statute applies, Quinn asserts that "the conduct alleged by Quinn and verified by Kandas and Meadow Lark gave rise to the accrual of a tort action." (Doc. 102 at 18.)

In support of their motion to dismiss, Defendants point to the Montana Supreme Court's discussion in *Milky Whey*, where the court noted that the legal duty allegedly violated in that case "would not exist in the absence of a contract, so

14

its violation does not give rise to a tort" and, therefore, could not give rise to jurisdiction under Rule 4(b)(1)(B).  342 P.3d at 18.  (Doc. 97 at 15–16.) Defendants appear to take the position that, because Quinn's claims arise from contractual agreements with Meadow Lark, Rule 4(b)(1)(B) cannot provide the basis for personal jurisdiction as to those claims.

Defendants are correct that Quinn's claim for unjust enrichment is not a tort for purposes of this subdivision of the long-arm statute. "There is a fundamental difference between breaching a contractual duty and committing a tort." *Dewey v. Stringer*, 325 P.3d 1236, 1243 (Mont. 2014).  A tort is a "civil wrong, other than breach of contract, for which a remedy may be obtained, usu[ally] in the form of damages." *Wilhite v. United States*, 2020 WL 6136382, at *3 (D. Mont. Aug. 3, 2020) (quoting *Black's Law Dictionary* (11th ed. 2019)), *findings and recommendations adopted*, 2020 WL 5105434 (D. Mont. Aug. 31, 2020).

Unjust enrichment, on the other hand, is an equitable claim for restitution, rooted in contract law, in which a contractual relationship is implied between the parties to prevent or remedy one party's inequitable gain.  *See Cordero v. Mont. State Univ.*, 553 P.3d 422, 431 (Mont. 2024) ("In the absence of a [written] contract between the parties, unjust enrichment may create an implied contract between the parties.")  Thus, an action for unjust enrichment is not a tort action, and does not provide the basis for jurisdiction under Rule 4(b)(1)(B).

15

Nevertheless, constructive fraud, as alleged in Count III of the SAC, is a tort in Montana. *See Romo v. Shirley*, 522 P.3d 401, 408 (Mont. 2022) (listing constructive fraud among the tort claims brought by the plaintiff); *Drescher v. Malee*, 519 P.3d 17, 23 n.7 (Mont. 2022) (referring to the "tort of constructive fraud"). *See also Dewey*, 325 P.3d at 1241 (stating that, "even if an action sounds in contract, tort-type damages are . . . available for traditional contract-related torts such as fraud") (internal quotation marks omitted).

Assuming for the time being that Quinn has alleged sufficient facts to support his constructive fraud claims against Defendants, the Court is persuaded that the alleged activities in Montana, discussed above in the context of Rule 4(b)(1)(A), constitute the commission of acts resulting in the accrual of a tort in Montana.

Finally, the Court turns to Quinn's joint tortious enterprise claims. The basis for Quinn's joint tortious liability theory is that Defendants either committed a tortious act in concert with Meadow Lark or gave substantial assistance to Meadow Lark in the course of Meadow Lark's tortious conduct. Either of these would constitute "the commission of any act resulting in accrual within Montana of a tort action." Mont. R. Civ. P. 4(b)(1)(B). Thus, assuming for the time being that this is a cognizable legal theory under Montana law, and that Quinn has alleged sufficient facts to demonstrate its accrual as to Usem and HUCGS, the Court is satisfied that

Defendants' alleged activities in Montana satisfy the requirements of Rule

4(b)(1)(B) as to Quinn's joint tortious enterprise claim.

### b. Whether the Exercise of Specific Jurisdiction Comports with Due Process

A federal district court may constitutionally exercise specific personal

jurisdiction over a particular claim brought against a defendant when (1) the

defendant "purposefully avails himself of the privilege of conducting activities in

the forum" or "purposefully direct[s] his activities [to] the forum or resident

thereof," (2) the plaintiff's claim "arises out of or relates to the defendant's forum-

related activities," and (3) the assertion of personal jurisdiction would "comport

with fair play and substantial justice." *Briskin v. Shopify, Inc.*, 135 F.4th 739, 750–

51 (9th Cir. 2025) (quoting *Schwarzenegger*, 374 F.3d at 802); *see also Ford*

*Motor Co.*, 592 U.S. at 358–59.  The plaintiff bears the burden of satisfying the

first two prongs of the test; the burden then shifts to the defendant to show the third

prong is not met. *Briskin*, 135 F.4th at 751.

### i. Purposeful Availment or Direction

In opposing the exercise of specific jurisdiction in this case, Defendants

assert that Quinn cannot show that their "actions were directed towards Montana or

that they purposefully availed themselves of the privileges of Montana law." (Doc.

97 at 31.)  In response, Quinn argues that the activities discussed above satisfy the

minimum contacts required for due process.  (Doc. 102 at 19.)

17

To establish that a defendant purposefully availed itself of the privilege of conducting activities within the forum state, the plaintiff "must show that the defendant deliberately reached out beyond its home—by, for example, exploiting a market in the forum State or entering a contractual relationship centered there." *Ford Motor Co.*, 592 U.S. at 359 (internal quotation marks and alterations omitted). "A showing that a defendant purposefully availed himself of the privilege of doing business in a forum state typically consists of evidence of the defendant's actions in the forum, such as executing or performing a contract there." *Schwarzenegger*, 374 F.3d at 802. "[B]usiness activity constitutes purposeful availment when that activity reaches out and creates continuing relationships and obligations in the forum state." *Silk v. Bond*, 65 F.4th 445, 457 (9th Cir. 2023). "Purposeful availment can be established by a contract's negotiations, its terms, its contemplated future consequences, and the parties' actual course of dealing." *Davis v. Cranfield Aero. Sols., Ltd.*, 71 F.4th 1154, 1163 (9th Cir. 2023) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 479 (1985)).

"A showing that a defendant purposefully *directed* his conduct toward a forum state, by contrast, usually consists of evidence of the defendant's actions outside the forum state that are directed at the forum, such as the distribution in the forum state of goods originating elsewhere." *Schwarzenegger*, 374 F.3d at 803 (emphasis added). When a defendant's efforts are "purposefully directed" toward

18

residents of the forum state, due process permits the exercise of personal jurisdiction even in the "absence of physical contacts" there. *Burger King*, 471 U.S. at 476. In other words, "[i]n tort cases, . . . jurisdiction may attach if an out-of-forum defendant merely engages in conduct aimed at, and having effect in, the situs state." *Morrill v. Scott Fin. Corp.*, 873 F.3d 1136, 1149 (9th Cir. 2017) (quoting *Ziegler v. Indian River Cty.*, 64 F.3d 470, 473 (9th Cir. 1995)). Purposeful direction requires a showing that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.* at 1142 (quoting *Schwarzenegger*, 374 F.3d at 803).

While purposeful availment and purposeful direction are distinct concepts, courts need not "adhere to an iron-clad doctrinal dichotomy to analyze specific jurisdiction." *Davis*, 71 F.4th at 1162. "Rather, when considering specific jurisdiction, courts should comprehensively evaluate the extent of the defendant's contacts with the forum state and those contacts' relationship to the plaintiffs' claims—which may mean looking at both purposeful availment and purposeful direction." *Id.* The first prong of the due process analysis "may be satisfied by purposeful availment, by purposeful direction, or by some combination thereof." *Id.* (internal citations and quotations omitted).

/ / /

19

Turning to the present case, the Ninth Circuit has determined that "[o]ut-of-state legal representation does not establish purposeful availment of the privilege of conducting activities in the forum state, where the law firm is solicited in its home state and takes no affirmative action to promote business within the forum state." *Sher v. Johnson*, 911 F.2d 1357, 1363 (9th Cir. 1990). In *Sher*, a California client brought a malpractice suit in California against Florida lawyers and a Florida law firm that had represented him in his Florida criminal prosecution. *Id.* at 1360. On appeal from dismissal for lack of personal jurisdiction, the court of appeals agreed with the district court that the lawyers were not subject to personal jurisdiction in California. The court highlighted that the legal representation occurred in Florida, not California, and that the firm did not solicit the client's business in California; rather, he had come to them in Florida. *Id.* at 1362. In addition to the firm making phone calls and sending letters to California, one of the lawyers traveled to California on three occasions to meet with the client in connection with the firm's representation of him. *Id.* at 1362–63. But the court made clear: "Even this action, however, when combined with the firm's underlying representation of a California client, does not constitute purposeful availment of the privilege of conducting activities within California." *Id.* at 1363. Accordingly, the court concluded that these contacts were "too attenuated" to conclude that the lawyers purposefully availed themselves of the privilege of conducting activities

within the forum.  *Id.*[2]

In contrast, the Ninth Circuit held that an out-of-state attorney purposefully directed his conduct into the forum state when he rendered legal services on behalf of his client that was intended to have an effect in the forum state.  *Lake v. Lake*, 817 F.2d 1416, 1423 (9th Cir. 1987).  In *Lake*, a California lawyer obtained an ex parte order from a California state court that awarded his client temporary custody of her child who, at the time, was residing with the child's father in Idaho.  *Id.* at 1419.  The lawyer's client then took the ex parte order to Idaho and used it to secure the assistance of the district attorney's office and the sheriff's department in taking custody of her child.  *Id.*  The child's father and stepmother subsequently brought tort claims against the lawyer in Idaho, which were dismissed by the district court for lack of personal jurisdiction.  *Id.*

On appeal, the Ninth Circuit reversed.  The court of appeals noted that, based on the plaintiffs' allegations, the lawyer (1) knew the plaintiffs and the child were in Idaho when he obtained the ex parte order in California, (2) knew his client would take the order to Idaho to attempt to gain custody of the child, and (3)

---

[2] The court ultimately concluded, however, that, unlike the individual lawyers, the firm itself was subject to personal jurisdiction in California.  This is because the firm's retainer agreement required that the client execute a deed of trust in favor of the firm, encumbering his California residence.  *Sher*, 911 F.2d at 1360.  The court found that, "[b]y requiring the execution of a deed to California real estate," the firm had "look[ed] to the laws of California to secure its right to payment under its contract" with the client.  *Id.* at 1363.

intended his client to use the order to obtain the assistance of the local authorities
in Idaho. *Lake*, 817 F.2d at 1423. The court reasoned that "those allegations, if
proved, establish that [the defendant] took those actions for the very purpose of
having their consequences felt in the forum state." *Id.* (internal quotation marks
omitted). Accordingly, the lawyer's "only contact with the forum state is the
purposeful direction of a foreign act having effect in the forum state," which was
sufficient for purposeful direction and the other requirements for specific
jurisdiction. *Id.* (internal quotation marks omitted).

A district court case in this circuit further demonstrates that an out-of-state
attorney purposefully directs his activities into the forum state when he performs
legal services and drafts a contract on behalf of his forum-state client, such that the
forum state "is the focal point both of the [contract] and of the harm suffered."
*David John, M.D., Inc. v. Polisky*, 2020 WL 2490097, at *11 (D. Haw. May 14,
2020) (quoting *Walden*, 571 U.S. at 287). In that case, a group of Hawaii
physicians sought to set up a limited liability company (LLC) for their medical
group, and retained a California lawyer to assist them in doing so. *Id.* at *1–2. A
dispute arose between one physician in the group, Dr. John, and the other
members. In the aftermath of that dispute, Dr. John sued the California lawyer. *Id.*
at *3. Dr. John alleged that the lawyer conspired with the other members of the
group, affixed Dr. John's signature to a fabricated and backdated version of the

22

LLC agreement, and transmitted it to the other members of the group to use against Dr. John in state court. *Id.* On the lawyer's motion to dismiss, the court concluded there was no "significant contact" between the lawyer and Hawaii and, therefore, no purposeful availment. *Id.* at *9.

But as to purposeful direction, the court disagreed that the plaintiff was the defendant's only link to the forum, noting that "[t]he place where [the attorney] compiled and fabricated the LLC Agreement (California) is the only aspect of this case that does not involve Hawaii." *David John, M.D.*, 2020 WL 2490097 at *11. Given that (A) all members of the medical group were Hawaii residents, (B) the agreement drafted by the lawyer established a Hawaii LLC and was to be performed in Hawaii, and (C) the lawyer intended the members to use the allegedly fabricated agreement in Hawaii state court, Dr. John had made a showing that the lawyer's intentional acts were expressly aimed at Hawaii, causing harm he knew was likely to be suffered in the forum state. *Id.* at *10–11.

In a case decided by the Sixth Circuit, an out-of-state attorney purposefully directed his conduct into the forum state by creating communications for his client's use, which his client transmitted to various recipients, including in the forum state. *Schneider v. Hardesty*, 669 F.3d 693, 702–03 (6th Cir. 2012). In that case, a Utah attorney wrote a pair of letters intended for the investors of his client, a Utah resident. *Id.* at 695. The lawyer was the signatory on the letters, which

attested to his client's integrity, made representations regarding the status of the investors' funds, and requested that the recipients transmit certain information to his client. *Id.* at 696. One of the investors, an Ohio resident, later sued the lawyer in Ohio federal district court, and alleged that the letters contained false and misleading statements by which the lawyer furthered his client's fraudulent scheme. *Id.* Although the lawyer only provided the letter to his client, the court of appeals found this did "not make [the lawyer's] actions any less purposefully directed at the recipient investors," given his "intimate involvement in the creation of the letters and his knowledge of their intended purpose." *Id.* at 702–03. Further, even if there was no direct evidence he knew the states to which the letters would be sent, he "at least [had] access to that information" and, therefore, "knew, or at least should have known, that the letters were bound for an investor in Ohio." *Id.* at 703. The court concluded: "By drafting and providing [his client] with the letters for distribution, [the lawyer] was the key actor in directing the harm inflicted on the recipients," including the Ohio plaintiff, and was, therefore, subject to personal jurisdiction in Ohio. *Id.*

In another case outside of this circuit, the district court in the Northern District of Illinois concluded that out-of-state attorneys purposefully directed their activities into the forum state when they drafted allegedly misleading documents as part of a business transaction in that state. *Walls v. VRE Chi. Eleven, LLC*, 344 F.

24

Supp. 3d 932, 944–45 (N.D. Ill. 2018).  In that case, the plaintiffs alleged they

were fraudulently induced into purchasing property in Illinois by various

misrepresentations and omissions by Texas sellers and their Texas attorneys.  *Id.* at

942.  Specifically, the plaintiffs alleged that the documents the sellers' lawyers

drafted and "participated in . . . providing" to them included false statements

regarding the existence of other agreements affecting the property.  *Id.* at 942–43.

The lawyers moved to dismiss, contending that only the plaintiffs had connections

to Illinois, while the lawyers never contacted anyone there or otherwise directed

their conduct there, even if their alleged conduct affected the plaintiffs.  *Id.* at 944.

The court was unpersuaded by this, noting "the entire purpose of the allegedly

tortious conduct" was "to sell eleven properties *located in Illinois*."  *Id.* (emphasis

in original).  Therefore, because the lawyers "expressly aimed their conduct at

Illinois by engaging in a fraudulent scheme regarding Illinois," they were subject

to personal jurisdiction in Illinois.  *Id.*

A fair reading of these cases demonstrates that a lawyer representing an out-

of-state client, as in *Sher*, is not subject to jurisdiction in the client's state of

domicile merely because he represents the client in a matter in another jurisdiction.

On the other hand, where an attorney performs legal services aimed or directed to a

state, or performs legal services knowing the impact will be felt in that state, he

may be subject to specific personal jurisdiction.  Here, the Court concludes that

Quinn's allegations regarding Defendants fall in the latter category of cases, and that the first prong of the due process analysis is satisfied.

The circumstances presented by Defendants' out-of-state legal representation differ from those of the lawyers in *Sher* in that, unlike in *Sher*, Defendants provided legal services to Meadow Lark in connection with the operation of its business in the forum state, Montana.

Rather, as in *Lake*, Defendants purposefully directed their activities into Montana when they rendered legal services on behalf of Meadow Lark that they intended to have an effect in Montana. Similar to the circumstances there, Quinn alleges that Defendants intended that their client would use the materials drafted on its behalf to implement the Lease Program from its headquarters in Montana. (*See* Doc. 91 at 6, 8, 15, 43–44. *See also* Docs. 102 at 19; 102-5 ¶¶ 17, 20, 25.) Those allegations, if proved, establish that Defendants took those actions for the very purpose of having the scheme realized in Montana. Such contacts with Montana constitute the purposeful direction of a foreign act having effect in the forum state.

Further, just like the attorney in *David John, M.D.*, Defendants are alleged to have drafted the Lease Program documents on behalf of their forum-state client and performed other legal services that harmed a party to that contract—making Montana the focal point of both the contract and the harm suffered. Like in that case, the place where Defendants completed their work on those documents is the

26

only aspect of this case that does *not* involve Montana.  Otherwise, the agreement drafted by Defendants established a program governed by Montana law, with certain terms to be performed in Montana, and—in the event of a dispute with any of the drivers—to compel arbitration in Montana, controlled by Montana law.  (*See* Doc. 102-5 ¶¶ 17, 20, 25.)  In other words, akin to *David John, M.D.*, the allegations in this case are that Defendants legal services were intentional acts expressly aimed at Montana, causing harm they knew was likely to be suffered in Montana.

Additionally, the Sixth Circuit's decision in *Schneider* supports a finding that Defendants purposefully directed their conduct into Montana when they created materials for Meadow Lark's use that were then transmitted to recipients in Montana.  Similar to the circumstances in that case, Defendants drafted their work product in another state but, based on Quinn's allegations, they either knew or should have known that Meadow Lark would target at least some Montana drivers with that work product.  Just like the lawyers in *Schneider*, Defendants may have not directly transmitted anything to Quinn or the other drivers, but their alleged conduct was no less purposefully directed, given their intimate involvement in the creation of the Lease Program documents, and their alleged knowledge of those documents' intended purpose.

/ / /

27

Finally, *Walls* supports the conclusion that Defendants purposefully directed their activities into the forum state when they drafted documents for Meadow Lark to use in its Montana business transactions. Similar to the plaintiffs in that case, Quinn alleges he and the other drivers were fraudulently induced into signing onto the Lease Program by various misrepresentations and omissions that were part of a fraudulent scheme, facilitated and enabled by the documents drafted by Defendants. The entire purpose of the allegedly tortious conduct was to expand the business of Meadow Lark from its headquarters in Montana. (*See* Doc. 91 at 15, 44.) Thus, Quinn's allegations in the SAC include that Defendants expressly aimed their conduct at Montana by engaging in a fraudulent scheme regarding Montana.

Accordingly, Quinn's allegations establish a prima facie case that Defendants committed an intentional act expressly aimed at the forum state, arising out of contacts they created with the forum state, and causing harm they knew was likely to be suffered in the forum state. Thus, the first requirement for the due process analysis is satisfied.

### ii. Arising out of or Relating to Contacts with the Forum

In addressing whether Quinn's claims against them arise out of or relate to their contacts with the forum, Defendants contend that they "did not transact any business in Montana" and "had no contact with the Plaintiff or the putative

28

members of the proposed class"; therefore, "Plaintiff's complaint cannot possibly arise from business conducted in this state" nor "arise out of or relate to Defendants' forum-related activities." (Docs. 97 at 22; 105 at 10.) In response, Quinn argues that his claims "arise out of and relate to the Defendants' forum-related activities because the entire focus of the Quinn case is the illegal lease-back program that Defendants helped design and implement . . . ." (Doc. 102 at 19.)

For a plaintiff's claim to "arise out of" the defendant's contacts in the forum state, there must be a causal relationship between the defendant's in-state contacts and the plaintiff's claim. *Ford Motor Co.*, 592 U.S. at 362; *see also Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998) (stating that a claim arises out of a defendant's forum-related activities if the plaintiff "would not have been injured 'but for'" the defendant's forum-related conduct). But this second prong of specific jurisdiction is also satisfied when the plaintiff's claims merely "relate to" those contacts—i.e., when there is "another activity or occurrence involving the defendant that takes place in the State," even if that activity did not cause the injury. *Ford Motor Co.*, 592 U.S. at 362.

Here, Quinn's claims both "arise out of" and "relate to" Defendants contacts in Montana. As previously concluded, the claims against Defendants "aris[e] from . . . the transaction of [their] business within Montana." *See* Mont. R. Civ. P. 4(b)(1)(A). Based on the allegations in the SAC, there is a causal relationship

29

between those activities that Defendants purposefully directed into Montana and Quinn's alleged injuries.  To the extent there are any aspects of Quinn's claims that do not arise out of Defendants' contacts in Montana, there is no aspect of his claims that do not at least relate to those contacts.  Accordingly, the second requirement for specific jurisdiction is satisfied.

### iii.    Comporting with Fair Play and Substantial Justice

Quinn has, therefore, plausibly alleged facts supporting the conclusion that Defendants purposefully directed their activities toward Montana and that his claims are related to Defendants' conduct.  Thus, the burden shifts to Defendants to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Briskin*, 135 F.4th at 751 (quoting *Burger King*, 471 U.S. at 477).

Courts in the Ninth Circuit use a seven-factor balancing test to determine whether the exercise of personal jurisdiction comports with fair play and substantial justice:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Briskin*, 135 F.4th at 761 (citation and internal quotation marks omitted).

30

Defendants argue that the "exercise of jurisdiction in this case would not be reasonable" because it would be based on a theory that would "presumably subject them to jurisdiction in every state in which the drivers the Meadow Lark entities executed contracts with resided." (Doc. 105 at 10.) Although Defendants do not directly address the above fairness factors, they nevertheless contend that "[s]uch a result is clearly not contemplated" by case precedent and "would be inappropriate under the Due Process Clause of the Fourteenth Amendment." (*Id.* at 10–11.)

Quinn argues that the Ninth Circuit's fairness factors weigh in favor of exercising jurisdiction in this case. He asserts that (1) Defendants purposefully interjected themselves into Montana's affairs through the activities discussed above; (2) the burden on Defendants to defend themselves in Montana is minimal because this case has been pending for several years and HUCGS was already involved before being named a defendant; (3) Defendants have not raised the issue of any conflict with Minnesota's sovereignty; (4) Montana has a strong interest in having the case adjudicated in this forum because the Lease Program at issue was operated by a Montana business and the other aspects of this case are already being litigated here; (5) commencing parallel litigation in Minnesota is inconsistent with an efficient judicial resolution of this controversy; and (6) it is important to Quinn's interest in convenient and effective relief that his claims against Usem and HUCGS be litigated in the same forum as his claims against the other defendants.

The Court finds that Defendants have failed to meet their burden to present a compelling case that the exercise of jurisdiction is not reasonable. Further, the Court agrees that Quinn's analysis of the above factors shows such exercise of jurisdiction comports with fair play and substantial justice. Thus, the third and final requirement for specific jurisdiction is satisfied.

Accordingly, having already concluded that Montana's long-arm statute authorizes the exercise of jurisdiction over Quinn's claims, and determining here that the exercise of specific jurisdiction over those claims comports with due process, the Court concludes that it does not lack personal jurisdiction over those claims. Therefore, Defendants' motion to dismiss on those grounds should be denied.

### B.    Failure To State a Claim

In addition to their motion to dismiss for lack of personal jurisdiction, Defendants assert that Quinn's claims against them are subject to dismissal pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. Defendants point out that the paragraphs describing Quinn's claims for constructive fraud and unjust enrichment do not include any mention of Usem or HUCGS. (Doc. 97 at 26.) They also argue that Quinn's joint tortious enterprise claim contains only legal conclusions that mirror the elements in the Restatement (Second) of Torts. (*Id.* at 26–30.) In response, Quinn points to the specific facts in

32

the SAC that are incorporated by reference into his allegations supporting each of

his three claims against Usem and HUCGS.  (Doc. 102 at 25–28.)

### 1.    Constructive Fraud

Montana law defines the tort of constructive fraud as consisting of either:

> (1) any breach of duty that, without an actually fraudulent intent,
> gains an advantage to the person in fault or anyone claiming under the
> person in fault by misleading another person to that person's prejudice
> or to the prejudice of anyone claiming under that person; or (2) any
> act or omission that the law especially declares to be fraudulent,
> without respect to actual fraud.

Mont. Code Ann. § 28-2-406.  In addition, the Montana Supreme Court has stated

that a plaintiff must establish the following eight elements to make a prima facie

case of constructive fraud:

> [1] a representation; [2] the falsity of that representation; [3] the
> materiality of that representation; [4] the speaker's knowledge of that
> representation's falsity or ignorance of its truth; [5] the hearer's
> ignorance of that representation's falsity; [6] the hearer's reliance
> upon the truth of that representation; [7] the hearer's right to rely upon
> that representation; and [8] the hearer's consequent and proximate
> injury or damage caused by reliance on that representation.

*Dewey*, 325 P.3d at 1240.

In the SAC, Quinn alleges that Meadow Lark "owed [the drivers] a duty of

full and truthful disclosure," and "breached this duty by concealing material facts"

from the drivers.  (Doc. 91 at 37.)  Quinn alleges that Meadow Lark "omitted . . .

material facts," and "intended that Drivers would rely on them in making the

decision" to participate in the Lease Program, and that "the Drivers did so."  (*Id.* at

33

39.)  Quinn alleges that "[t]he undisclosed and true material facts were known only to Meadow Lark and were not within the reasonable attention and observation of Quinn and other Drivers" that participated in the Lease Program, and "[h]ad Meadow Lark provided the full truth" to them, they would not have participated. (*Id.*)  Quinn alleges that he and the other drivers "suffered damages as a direct result of Meadow Lark's material and omissions . . . , were defrauded out of their labor and full and proper compensation for same, and Meadow Lark gained an unconscionable advantage over them."  (*Id.*)  Quinn alleges that "Meadow Lark acted intentionally with malice and/or with reckless disregard" of Quinn and the other drivers' rights.  (*Id.* at 39–40.)

In contrast to these allegations, the SAC includes no such factual allegations regarding Usem or HUCGS.  In his response brief, Quinn contends that Defendants "had superior knowledge about the lease-back scheme, its intent, and its consequences" and, nevertheless, "enabled and substantially assisted in the implementation of the scheme."  (Doc. 102 at 29.)  But these allegations do not establish a prima facie case for constructive fraud.  Quinn acknowledges that his constructive fraud claims rest on the breach of a duty (*id.* at 28–29; *see also* Doc. 91 at 36), but does not allege any facts to support that Defendants owed him or any of the other drivers a duty.  The SAC also does not allege a single representation made by Usem or HUCGS—let alone one directed at him or the other drivers, or

34

one on which anyone relied.

Accordingly, the Court finds that Quinn has failed to state a claim for constructive fraud against either Usem or HUCGS, and recommends that Defendants motion to dismiss this claim be GRANTED.

### 2.    Unjust Enrichment

To bring a claim of unjust enrichment, the plaintiff must establish the following elements: "(1) a benefit was conferred upon the recipient by the claimant; (2) the recipient knew about or appreciated the benefit; and (3) the recipient accepted or retained the benefit under circumstances rendering it inequitable for the recipient to do so." *Missoula Cty. v. State*, 547 P.3d 1268, 1275 (Mont. 2024). Put another way, "[u]njust enrichment of a person occurs when he has and retains money or benefits which in justice and equity belong to another." *Christian v. Atl. Richfield Co.*, 358 P.3d 131, 150 (Mont. 2015) (quoting *Lawrence v. Clepper*, 865 P.2d 1150, 1156 (Mont. 1993)).

The facts alleged in the SAC do not support a cause of action for unjust enrichment against Defendants. Quinn alleges in the SAC that "Quinn and the Drivers conferred benefits on Defendants by providing driving services to Meadow Lark and paying expenses on its behalf." (Doc. 91 at 42.) It is unclear how Defendants, as legal counsel for Meadow Lark, were conferred a benefit under such circumstances. In his response brief, Quinn contends that this element is

satisfied because Defendants "received the benefit of Montana legal business over a period of years." (Doc. 102 at 29.) This allegation does not support a cause of action for unjust enrichment, however, because the business from which Defendants benefited was in exchange for the legal services Defendants provided to Meadow Lark.

Having failed to allege any benefit that he conferred upon Defendants, let alone one that Defendants subsequently kept despite it "belong[ing] to" him, Quinn has failed to state a claim for unjust enrichment against either Usem or HUCGS. Accordingly, the Court recommends that their motion to dismiss this claim be GRANTED.

### 3.    Joint Tortious Enterprise

Quinn alleges that Montana tort law recognizes a cause of action for joint tortious enterprise. The Montana Supreme Court has adopted Restatement (Second) of Torts § 876, which provides for liability for harm to a third person resulting from the tortious conduct of another. That section provides as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
> (a) does a tortious act in concert with the other or pursuant to a common design with him, or
> (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

36

*Newman v. Lichfield*, 272 P.3d 625, 633 (Mont. 2012); *Sloan v. Fauque*, 784 P.2d 895, 896 (Mont. 1989). A plaintiff need only establish that one of the subsections of § 876 applies. *Newman*, 272 P.2d at 633.

As previously determined, Quinn has failed to state a claim for constructive fraud or unjust enrichment against Defendants in the SAC. He has also failed to otherwise allege that Defendants independently committed a tortious act or breached a duty to Quinn. Thus, subsections (a) and (c) do not apply here, since Quinn does allege facts to establish that Defendants committed a tortious act (as required for subsection (a)), or that Defendants conduct constituted a breach of any duty to Quinn (as required for subsection (c)).

Under subsection (b), however, Quinn can state a claim for relief by alleging facts to show that Defendants knew that Meadow Lark's conduct constituted a breach of duty and gave substantial assistance or encouragement to Meadow Lark. Restatement (Second) of Torts § 876(b). To establish liability for the conduct of another under for subsection (b), three requirements must be met: "1) the other's conduct is a breach of duty, 2) he knows that the other's conduct is a breach of duty, and 3) he provides substantial assistance or encouragement to the other for such conduct." *Newman*, 272 P.3d at 633–34.[3]

---

[3] This Court has recognized and applied this subsection on several occasions. *See e.g., Butler v. Unified Life Ins. Co.*, 2019 WL 5302491, at *21–22

First, as to whether Meadow Lark's conduct was the breach of a duty, Quinn alleges in the context of his claim for constructive fraud that Meadow Lark breached its "duty of full and truthful disclosure . . . by concealing material facts" when "offering, advertising, pitching and selling" the Lease Program to Quinn and the other drivers. (Doc. 91 at 37.) Quinn also characterizes Meadow Lark's conduct as having "omitted . . . material facts." (*Id.* at 39.) Quinn has also alleged facts plausibly supporting these allegations. (*Id.* at 37-38.) This is sufficient to satisfy the first prong of § 876(b).[4]

---

(concluding that "there is sufficient evidence in the record to create an issue of fact concerning HII's knowledge of NBoA's misconduct, and whether HII provided encouragement and assistance to NBoA"), *findings and recommendations adopted*, 2019 WL 4745065 (D. Mont. Sept. 30, 2019); *Gersh v. Anglin*, 353 F. Supp. 3d 958, 969 (D. Mont. 2018) (concluding that "Gersh presented a cognizable theory by which the messages left by Daily Stormer readers may form a basis for damages against Anglin"); *Am. Trucking & Transp. Ins. Co. v. Nelson*, 2017 WL 3218097, at *9–10 (D. Mont. July 28, 2017) (concluding that "ATTIC has pled sufficient facts to make out a prima facie cause of action for Dooley's alleged acts in concert with the other Defendants"); *Howell v. Earl*, 2014 WL 2594235, at *20 (D. Mont. May 30, 2014) (concluding that "there are genuine issues of material fact as to whether the Deputies provided substantial assistance to each other, knowing that one of the other two was committing a tortious act"), *findings and recommendations adopted*, 2014 WL 2761342 (D. Mont. June 18, 2014).

[4] Quinn also alleges the breach of a duty in the context of his claim for breach of contract and the implied covenant of good faith. Absent a special relationship, however, such a breach is compensable only in contract by contract damages. *House v. U.S. Bank N.A.*, 481 P.3d 820, 831 (Mont. 2021). Here, there is nothing pleaded in the SAC that indicates Quinn asserts a cause of action for the tort of bad faith, nor has he pleaded the existence of a special relationship. Therefore, because the inquiry here is whether Defendants can be held liable for Meadow Lark's tortious conduct, a breach of the covenant of good faith in contract does not serve as the breach of duty contemplated by § 876(b).

Second, as to whether Defendants knew that Meadow Lark's conduct was a breach of a duty, Quinn alleges that Defendants "knew that the whole purpose of the scheme that they enabled was to allow Meadow Lark to seduce prospective drivers with false representations to amass a workforce that expanded Meadow Lark's business and revenue while shifting business cost and risk onto the Drivers." (Doc. 91 at 44.)  Quinn also alleges that Defendants "knew that Meadow Lark did not intend to treat the Drivers [as] true independent contractors but rather intended to control and micromanage them in all the same material ways that Meadow Lark controlled and managed the relatively small number of drivers who were on its company payroll." (*Id.*)  The Court finds these allegations are sufficient to allege that Defendants knew that Meadow Lark's conduct was a breach of duty.  Therefore, the second prong of § 876(b) is satisfied.

As to the third and final requirement of § 876(b), Quinn alleges that, "[d]espite this knowledge," Defendants "used their capacity as lawyers to draft documents that it knew enabled an illegal scheme." (Doc. 91 at 44; *see also id.* at 6, 15, 20–21.)  Quinn's allegations also include that Usem met with Kandas to "plan and execute the implementation of the scheme." (*Id.* at 6.)  The Court finds these allegations are sufficient to plausibly allege that Defendants "provide[d] substantial assistance or encouragement to the other for such conduct"—satisfying the third and final prong of § 876(b).  *Newman*, 272 P.3d at 634.

Accordingly, Quinn has adequately pleaded a claim for joint tortious enterprise, as recognized in *Sloan* and *Newman*, that would subject Defendants to liability for harms caused by the alleged tortious conduct of Meadow Lark. Thus, the Court recommends that Defendants' motion to dismiss Count VI pursuant to Rule 12(b)(6) be denied.

## IV. CONCLUSION

Based on the foregoing, IT IS RECOMMENDED that Defendants' Renewed Motion To Dismiss (Doc. 96) be GRANTED as to Quinn's claims for constructive fraud (Count III) and unjust enrichment (Count V), and DENIED in all other respects.

NOW, THEREFORE, IT IS ORDERED that the Clerk shall serve a copy of the Findings and Recommendations of United States Magistrate Judge upon the parties. The parties are advised that pursuant to 28 U.S.C. § 636, any objections to the findings and recommendations must be filed with the Clerk of Court and copies served on opposing counsel within fourteen (14) days after service hereof, or objection is waived.

DATED this 8th day of August, 2025.

_____
TIMOTHY J. CAVAN
United States Magistrate Judge